# UNITED STATES DISTRICT COURT
## District of Kansas

UNITED STATES OF AMERICA,

      Plaintiff,

      v.                  CASE NO. 23-20010-03-DDC

OLEG CHISTYAKOV,

      Defendant.

## GOVERNMENT'S SENTENCING MEMORANDUM

APPEARS NOW the United States of America, by and through undersigned counsel, and respectfully submits the following in support of the government's recommendation for Oleg Chistyakov's sentence in this case.

In accord with the plea agreement and as supported below, the government recommends a sentence of 37 months' imprisonment.

## I.    PROCEDURAL HISTORY

On December 14, 2023, a Complaint charged Mr. Chistyakov with conspiracy and smuggling offenses in D. Kan. No. 23-mj-8247-ADM. (Doc. 1, Complaint.)

1

On March 19, 2024, authorities in Latvia arrested Mr. Chistyakov on the Complaint in this case through a provisional arrest warrant request.    (Doc. 147, Presentence Report ("PSR") at ¶ 4.    On March 27, 2024, the grand jury returned a Second Superseding Indictment in this case that added Mr. Chistyakov as a defendant, which charged him with a multi-prong export conspiracy, export violations, smuggling, money laundering conspiracy, and international money laundering offenses.    (Doc. 75, 2d Super. Indictment.)

On July 18, 2024, the Latvian Supreme Court denied Mr. Chistyakov's appeal contesting his extradition to the United States.    (Doc. 147, PSR at ¶ 6.)

On August 21, 2024, Mr. Chistyakov had his initial appearance in Kansas. (Doc. 89, Minutes.)    On August 26, 2024, Mr. Chistyakov pled not guilty to the charges, and he was ordered detained pending trial.    (Doc. 93, Minutes.) On December 5, 2024, the Court released Mr. Chistyakov on conditions by agreement of the parties.    (Doc. 110, Minutes.)

On September 30, 2025, Mr. Chistyakov pled guilty to Count 1 of the Second Superseding Indictment pursuant to a plea agreement.    (Doc. 141, Minutes; Doc. 143, Plea Agreement.)    Count 1 charged a multi-prong conspiracy to export goods to Russia without first obtaining the required licenses, to fail to file or submit false or misleading export information to the

U.S. Department of Commerce, and to smuggle goods outside the United States. (Doc. 75, 2d Super. Indictment at 9-10.)

The U.S. Probation Office conducted an investigation and submitted a Presentence Report.   (Doc. 147, PSR.)   As identified by the parties in the Plea Agreement, the PSR determined the base offense level to be 26.   (*Id.* at ¶ 91; Doc. 143, Plea Agreement at 3-4.)   With a three-level reduction for acceptance of responsibility and a two-level reduction for being a zero-point offender, the total offense level is 21.   (Doc. 147, PSR at ¶¶ 97-100.)   With no criminal history, the applicable guidelines range is 37-46 months' imprisonment.   (*Id.* at ¶ 122.)

Mr. Chistyakov made fifteen objections to the PSR that are contained in the Addendum to the PSR along with responses from the government and the Probation Officer.   (*Id.* at ¶¶ 162 - 230.)

II.   FACTUAL BACKGROUND

Mr. Chistyakov was born in Latvia when it was part of the Union of Soviet Socialist Republics ("U.S.S.R." or "Soviet Union").   Mr. Chistyakov's choices to smuggle avionics from the United States into Russia, circumventing export controls on Russia, caused his fellow Latvian citizens to consider those acts as akin to "war crimes."

A.    *Historical Setting*[1]

A secret protocol of the German-Soviet Nonaggression Pact from August 23, 1939, separated eastern Europe under the influence of Germany or under the influence of the Soviet Union.   Latvia was included in the part of eastern Europe subjected to Soviet Union influence.   Slightly more than one week after entering this Pact, Adolf Hitler ordered the invasion of Poland to begin on September 1, 1939, which led to the declarations of war by Great Britain and France on September 3, 1939.   (While Germany invaded Poland from the west, the Soviet Union began its invasion of Poland from the east beginning on September 17, 1939.   Before the end of September, Germany and the Soviet Union adjusted their previously agreed upon division of Poland resulting in more territory controlled by Germany.)

In October 1939, Latvia acceded to Soviet Union pressure, so the U.S.S.R. took control of various military bases in Latvia.   By June 1940, Soviet troops invaded and occupied Latvia, deported the Latvian President, and installed new "elected" leaders.   By August 5, 1940, Latvia was incorporated into the Soviet Union.   In the first year of Soviet occupation, tens of thousands of Latvians were deported to eastern portions of the U.S.S.R., including prison camps in

---

[1] *See generally*, The Museum of the Occupation of Latvia, https://okupacijasmuzejs.lv/en/history (last accessed March 12, 2026).

Siberia.

During part of the German invasion of the Soviet Union from mid-1941, Germany occupied Latvia, conscripting Latvians into the German army and executing more than 50,000 Latvian Jews. By 1944, the Soviet Union regained control of most of Latvia with an estimated 100,000 Latvians fleeing to other countries.

Following World War II, more than 125,000 Latvians were part of the Soviet Union's mass deportations to northern Russia and Siberia. In the 1950s, the ruling communist party in Latvia was dominated by those not originally from Latvia, which continued until the 1980s. Following the 1990 election, the Latvian legislature passed a declaration to renew independence.[2] Initially, the Soviet Union resisted the Latvian independence effort, which led to some violent responses in 1991. However, by September 1991, the Soviet Union recognized Latvian independence. Yet, tensions remained between Latvia and the Soviet Union from the decades of "occupation" and the eventual prosecution of some Soviets for war crimes from World War II.

This is summarized on a sign explaining the "Museum of the Occupation of Latvia" in Riga.

---

[2] The Berlin Wall "fell" on November 9, 1989.

**The Museum of the Occupation of Latvia**

This is a story about the Latvian nation and Latvian state that it founded, fought for and built on its ancestral land as the German and Russian empires collapsed at the end of the First World War.

This is a story of the conspiracy between Communist Soviet Union and Nazi Germany and the three occupations that dismantled the Latvian state, defiled the land, and, within half a century, brought the nation to the brink of extinction.

This is a story about oppression, terror and violence; about defiance, resistance and heroism; but also – about helplessness, fear and betrayal.

Above all, however, this is a story of the stamina and spiritual strength that allowed the Latvian nation to renew the Latvian state and to re-join the world community of independent countries.

B.    *Geographical Setting*

Latvia is situated on the Baltic Sea and part of what is generally referred to as one of the "Baltic States."    As depicted in this map below, Latvia is between Estonia and Lithuania on the Baltic Sea across from Sweden and Finland.    Latvia's eastern border is approximately 100 miles with Russia, and its southeastern border is approximately 75 miles with Belarus.



### C.    Case Context

On February 24, 2022, the Russian Federation ("Russia") invaded Ukraine.    That invasion caused the United States to impose additional restrictions on the export of avionics from the United States to Russia, directly impacting the business activity of Mr. Chistyakov and his co-conspirators at KanRus.    As seen on the map above and considering the historical background of Latvia and Russia, invasions by Russia of its neighbors is a major concern of Latvians.

On March 4, 2022, Latvia's capital city of Riga renamed the street where Russia's embassy sits to Ukrainas Neatkarības iela in Latvian, "Ukrainian

Independence    Street,"    as    depicted    in    the    image    below.    *See*

https://www.reuters.com/world/latvian-capital-rename-russian-embassy-

address-independent-ukraine-street-2022-03-04/ (last accessed March 12, 2026).



Following Mr. Chistyakov's arrest, he had an appearance in Latvian court

on the Provisional Arrest Warrant based on the Complaint filed in this case.

The prosecuting authority in Latvia had the Complaint from this case as part of

that proceeding in Latvia.   One of the prosecutors spoke with members of the

prosecution team as part of that preparation in Latvia.   During the course of

that conversation, the prosecutor described Mr. Chistyakov's offenses as "war

crimes" and as part of their anticipated basis for Mr. Chistyakov to remain in

custody.   Because the avionics supported Russian aircraft, because Russia

invaded Ukraine, because Russia is a neighbor to Latvia, and because Latvia was

8

concerned Russia could turn its sights on them, a genuine fear existed and caused their view of this conspiracy as directly connected to the Russian government and its war endeavors.

As such, the gravity of these offenses clearly differs depending upon the history, the geography, and the overall context.

D.    *Minimization Effort*

While Mr. Chistyakov voluntarily spoke with federal agents following his arrest in Latvia, and also after his guilty plea in Kansas, he failed to acknowledge his whole role in this conspiracy.    Even through many of his objections to the PSR, Mr. Chistyakov seeks to shift and avoid blame.

As an example, the first paragraph of the factual basis of his plea agreement states that he conspired with others before the invasion of Ukraine "to willfully export, attempt to export, and cause the export of avionics equipment from the United States to customers in Russia and Russian customers in other foreign countries by filing false export forms with the U.S. Government or assisting in such filing."    Doc. 143, Plea Agreement at 2.    This means Mr. Chistyakov knowingly violated the law regarding exports before the invasion of Ukraine.

That knowledge and effort to evade export laws and regulations is illustrated in the November 2020 shipment of avionics equipment with an FSB sticker attached.    Mr. Chistyakov told his co-conspirator to simply remove the sticker and secure the repairs because "they knew that the FSB was an intelligence and security agency of the Russian Federation and that if the U.S. company that repaired the avionics equipment saw the sticker, it would not proceed with the transaction."    *Id.*

As outlined in the Second Superseding Indictment, not only did Mr. Chistyakov and his co-conspirators hide the entity for whom the repair work was being done, but wholly misrepresented the value of the equipment to avoid reporting any of the required export information with the U.S. Government. Additionally, their scheme included misrepresenting the countries involved in shipping and receiving the particular equipment by not identifying Russia.    *See* Doc. 75, 2d Super. Indictment at 15-16.

Similarly, in early 2021, Mr. Chistyakov and his co-conspirators falsified the value of avionics equipment purchased in the United States so that false and misleading information was submitted to the U.S. Government regarding that export in April 2021.    Additionally, Mr. Chistyakov and his co-conspirators failed to disclose the equipment was being delivered to Russia.    *See id*. at 16-17.

Regardless of when equipment is exported from the United States, Mr. Chistyakov and his co-conspirators were required to honestly identify the country to which the export was being sent and to honestly report the value of that equipment.   Mr. Chistyakov knew he was lying in both regards as part of this conspiracy because he thought it was advantageous.   Thus, the more complex the scheme became after the invasion of Ukraine only expanded the creativity of the conspirators to further violate the law.

Even as Mr. Chistyakov faces his sentence hearing next week, he fails to admit his role in this conspiracy and that his criminal acts preceded the invasion of Ukraine.   *See* Doc. 154, Sentencing Memorandum and Request for Variance at ¶ 11.

III.   <u>SENTENCING FACTORS</u>

A sentence at the low end of the applicable guidelines range of 37 months' imprisonment is sufficient, but not greater than necessary, to comply with the sentencing objectives set forth in 18 U.S.C. § 3553(a)(2).

As a matter of administration and to secure nationwide consistency in sentencing, the Guidelines should be the starting point and the initial benchmark for sentencing.   *See Rita v. United States*, 551 U.S. 338 (2007).   The Guidelines are not the only consideration.   *See United States v. Booker*, 43 U.S.

220 (2005).   The sentencing court must now engage only in a two-part analysis to determine the appropriate sentence.[3]   First, the court must consider the Guideline range.    A sentence within the guideline range is presumed reasonable.   *United States v. Kristl*, 437 F.3d 1050, 1055 (10th Cir. 2006). Second, the court evaluates any deviation from the guidelines range based on the sentencing factors in 18 U.S.C. § 3553(a) and the court's responsibility to impose a sentence that is "sufficient" but "not greater than necessary" to meet the sentencing objectives in that provision.   *United States v. Kaspereit*, 994 F.3d 2062, 1214 (10th Cir. 2021); *see also* U.S.S.G. § 1B1.1(b); *Rita*, 551 U.S. at 351. 18 U.S.C. § 3553(a) provides seven statutory factors for the court to consider so it may impose a sentence that is sufficient, but not greater than necessary to meet the objectives set forth in 18 U.S.C. 3553(a)(2).      The sentencing court can and should engage in a holistic inquiry of these factors.   *United States v. Lente*, 759 F.3d 1149, 1174 (10th Cir. 2014).

On appellate review, the court applies a two-step process.    First, the court confirms the district court correctly calculated the Guideline range. Second, the court examines under an abuse of discretion standard, the substantive reasonableness of the sentence, considering the totality of the

---

[3] The Sentencing Commission removed the previous second step of this process when it eliminated the consideration of departure factors from Chapter 5.

circumstances including the extent of any variance from the Guidelines.   *Gall v. United States,* 552 U.S. 38, 51, 169 L.Ed.2d 445 (2007).

A.    *Guideline Calculations*

As noted above, the PSR applied the facts and correctly calculated the guidelines range of 37-46 months imprisonment.

B.    *Sentence of 37 Months is Consistent with Relevant 3553(a) Factors*

Title 18, U.S.C. § 3553(a) provides, in part, the following.

(a) Factors to be considered in imposing a sentence.   The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection.   The court, in determining the particular sentence to be imposed, shall consider

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentences and the sentencing established for
(A) the applicable category of offense committed by the

applicable category of defendant as set forth in the guidelines
. . .

(5) any pertinent policy statement
. . .

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

*Id.*

The Government will not individually address each § 3553(a) factor. Most of the factors are implicitly taken into consideration by the applicable sentencing guideline provision in this case.   There are several particularly relevant factors that, when analyzed by this Court, demonstrate that a 37-month term of imprisonment is the sentence that is "sufficient, but not greater than necessary, to comply with the purposes set forth in" § 3553(a)(2).

1.      **The nature and circumstances of the offense.**

A defendant's guideline range takes into account several factors, including the facts of the case, the defendant's criminal history, and other relevant considerations.   Here, appropriate weight is given to these factors when Mr. Chistyakov's guideline range was calculated.

The national security nature of these violations is identified with the heightened base offense level of 26 under U.S.S.G. § 2M5.1(a)(1).  *See* PSR at ¶ 91.

> 2. **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment of the offense, to afford adequate deterrence, and to protect the public.**

The mere fact that the base offense level is 26 demonstrates its seriousness. The fact that Mr. Chistyakov violated the export laws and regulations of the United States before the invasion of Ukraine demonstrates a lack of respect for the law, particularly because he readily participated in submitting false information to better himself.  The fact that Mr. Chistyakov's fellow Latvians considered his participation in this conspiracy as participating in or promoting "war crimes" speaks to weightiness of his acts to those closest to Russia.

A 37-month sentence is necessary to promote respect for the law, provide just punishment, to afford adequate deterrence, and to protect the public.  It is evident that Mr. Chistyakov possessed little respect for the laws criminalizing his behavior as he readily participated in a scheme to deceive the U.S. Government and pursue various means to circumvent the export laws and regulations.

IV.    CONCLUSION

For the foregoing reasons, the government respectfully recommends this Court reject Mr. Chistyakov's request for a variance and impose a sentence of 37 months' imprisonment.

Respectfully submitted,

RYAN A. KRIEGSHAUSER
United States Attorney
District of Kansas

By:    s/Ryan J. Huschka
   Ryan J. Huschka
   Criminal Chief
   500 State Avenue, Suite 360
   Kansas City, Kansas 66101
   (913) 551-6730
   (913) 551-6541 (fax)
   Ryan.Huschka@usdoj.gov
   Kan. S. Ct. No. 23840

   s/Scott C. Rask
   Scott C. Rask
   Assistant United States Attorney
   500 State Avenue, Suite 360
   Kansas City, Kansas 66101
   (913) 551-6730
   (913) 551-6541 (fax)
   Scott.Rask@usdoj.gov
   Kan. S. Ct. No. 15643

## CERTIFICATE OF SERVICE

I certify that on March 13, 2026, I electronically filed this Sentencing Memorandum with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to those attorneys who have entered their appearance in the matter.

By:    s/Ryan J. Huschka
Ryan J. Huschka, #23840
Criminal Chief